**CONTRACT SERVICES, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 12–49 C.**

United States Court of Federal Claims.

E–Filed Under Seal: April 5, 2012.

E–Filed with Redactions: April 13, 2012.[1]

---

1. This Opinion was filed under seal on April 5, 2012, Docket Number (Dkt. No.), 24. The court directed that, if any party believed that the April 5, 2012 Opinion contained protected material that should be redacted before publication, that party shall, by motion filed on or before Friday, April 13, 2012 at 12:00 noon Eastern Daylight Time, request that such protected material be redacted. In response to the court's directive, plaintiff filed a motion to redact that stated that defendant had no objection to the motion. Mot. to Redact Op. (Motion), Dkt. No. 26, at 1. The Motion is GRANTED.

Darcy V. Hennessy, Mission, KS, for plaintiff. Leslie A. Boe, Mission, KS, of counsel.

Alex P. Hontos, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Cpt. Anthony V. Lenze, Trial Attorney, Contract and Fiscal Law Division, United States Army Legal Services Agency, Fort Belvior, VA, of counsel.

## OPINION

HEWITT, Chief Judge.

This is a post-award bid protest brought by plaintiff Contract Services, Inc. (CSI or plaintiff), the incumbent contractor providing logistics services to the Department of the Army (Army, government or defendant) at Fort Riley, Kansas. Plaintiff challenges the award of a contract by the Army to FedServices, Inc. (FedServices), pursuant to Solicitation Number W9124J–11–R–0003 (Solicitation). Plaintiff maintains that, had defendant properly considered its timely submitted proposal, defendant would have awarded the contract to plaintiff.

Before the court are plaintiff's Complaint for Declaratory and Injunctive Relief (Complaint or Compl.),[2] Docket Number (Dkt. No.) 1, filed January 25, 2012; plaintiff's Application for Preliminary and Permanent Injunction, Dkt. No. 2, and plaintiff's Memorandum of Points and Authorities in Support of Plaintiff['s] Application for Temporary Restraining Order and Motion for Preliminary and Permanent Injunctive Relief (Pl.'s TRO

---

2. Plaintiff's Complaint for Declaratory and Injunctive Relief (Complaint or Compl.), Dkt. No. 1, consists of fifty-three numbered paragraphs and several unnumbered paragraphs under a section titled "Prayer for Relief." *See generally* Compl. The court cites to the numbered paragraph(s) or, for material not in numbered paragraphs, to the page number(s).

Memo.),[3] Dkt. No. 2–1, filed January 25, 2012; Plaintiff's Motion for Judgment on the Administrative Record, Dkt. No. 11, and Memorandum in Support of Motion for Judgment on the Administrative Record (Pl.'s Mot.), Dkt. No. 11–1, filed February 22, 2012; Defendant's Motion to Dismiss, Cross–Motion for Judgment upon the Administrative Record, and Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record (Def.'s Mot.), Dkt. No. 15, filed March 2, 2012; plaintiff's Memorandum in Response to the United States' Motion to Dismiss[,] Cross–Motion for Judgment upon the Administrative Record and Contract Services, Inc.'s Reply to Defendant's Response in Opposition to Contract Services, Inc.'s Motion for Judgment on the Administrative Record (Pl's Resp.), Dkt. No. 20, filed March 15, 2012; and Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss, Motion for Judgment upon the Administrative Record, and Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record (Def.'s Reply), Dkt. No. 21, filed March 19, 2012.

Defendant filed the Administrative Record (AR) on February 8, 2012, see Dkt. No. 10, and the court granted Defendant's Unop-

posed Motion Seeking Leave to Amend and Correct the Administrative Record,[4] Dkt. No. 12, on February 28, 2012, see Order of Feb. 28, 2012, Dkt. No. 13. The parties completed briefing on March 19, 2012, and the court held oral argument telephonically on Wednesday, March 21, 2012 at 11:00 a.m. Eastern Daylight Time.[5] See Order of Jan. 26, 2012, Dkt. No. 7, at 2.

For the reasons stated below, the court DENIES plaintiff's Motion for Judgment on the Administrative Record and GRANTS defendant's Cross–Motion for Judgment on the Administrative Record.

## I. Background [6]

### A. The Solicitation

On March 23, 2011 defendant issued the Solicitation, which sought proposals for the provision of logistics supply support services at Fort Riley, Kansas, with a phase-in period to begin on August 1, 2011.[7] Compl. ¶ 11; AR 147, 149 (Solicitation). The selected offeror would be responsible for providing "Ammunition Supply Services, Retail Supply Management, Central Issue Facility (CIF) Operations, and Material Support Maintenance." AR 46 (Acquisition Docs.). The

3. Further to a conference call held with counsel for the parties on January 26, 2012, the court found plaintiff's application for preliminary injunction MOOT based on the parties' proposed briefing schedule and defendant's representation that it would stay any action on the awarded contract while the court considered the case. The court DEFERRED consideration of plaintiff's application for a permanent injunction until the court reached a decision on the merits. Because the court DENIES plaintiff's Motion for Judgment on the Administrative Record, see infra Part III.B, a permanent injunction is not warranted.

4. The Amended Administrative Record includes documents filed by plaintiff with the Government Accountability Office. Def.'s Unopposed Mot. Seeking Leave to Am. & Correct the AR, Dkt. No. 12, at 1. "The[se] additional documents bear [B]ates numbers AR 1544.1 through 1544.6 and 1568.1 through 1568.11." Id. at 1 n. 1.

5. The oral argument held on Wednesday, March 21, 2012 was recorded by the court's Electronic Digital Recording (EDR) system. The times noted in citations to the oral argument refer to the EDR record of the oral argument.

6. The facts are taken from plaintiff's Complaint; plaintiff's Memorandum of Points and Authorities in Support of Plaintiff['s] Application for Temporary Restraining Order and Motion for Preliminary and Permanent Injunctive Relief (Pl.'s TRO Memo.), Dkt. No. 2–1; Plaintiff's Motion for Judgment on the Administrative Record, Dkt. No. 11, and Memorandum in Support of Motion for Judgment on the Administrative Record (Pl.'s Mot.), Dkt. No. 11–1; the Administrative Record, Dkt. No. 10, and the Amended Administrative Record, Dkt. No. 14; and Defendant's Motion to Dismiss, Cross–Motion for Judgment upon the Administrative Record, and Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record (Def.'s Mot.), Dkt. No. 15. Unless otherwise noted, the facts do not appear to be in dispute.

7. Plaintiff states that the Solicitation was amended three times, Compl. ¶ 12; however, the Administrative Record indicates that the Solicitation was amended twice, see AR 1018 (First Amendment), 1055 (Second Amendment); accord Def.'s Mot. 4. Neither amendment appears to be relevant to plaintiff's protest before the court. See AR 1018 (First Amendment), 1055 (Second Amendment).

Solicitation contemplated the award of a firm fixed price contract to a single offeror. *Id.* at 52. Defendant estimated the value of the Solicitation to be $28 million. AR 146 (Solicitation Memo.).

The Solicitation provided that source selection would be conducted on a "best value full tradeoff" basis, which would include "an integrated assessment of Mission Capability, Past Performance, and Price Factors." AR 229 (Solicitation); *cf. id.* at 229–39 (detailing the evaluation criteria). The Solicitation further provided that "the government reserves the right to award to other than the lowest proposed price," and that "trade-offs between price and non-price factors" were permitted. *Id.* at 229 (capitalization omitted).

The Solicitation was designated as a 100% set aside for qualified Historically Underutilized Business Zone (HUBZone)[8] small business concerns (SBCs)[9] with a small business size standard of $35.5 million. AR 1 (Acquisition Docs.); AR 89 (Commerce Bus. Daily Docs.); Compl. ¶ 13; *see also* AR 147 (Solicitation). The Solicitation included the text of Federal Acquisition Regulation (FAR) 52.212–3, AR 239–50 (Solicitation), and FAR 52.219–1,[10] AR 250–52 (Solicitation), both of which require offerors to represent whether, "on the date of this representation," the offeror is listed on the list of qualified HUBZone SBCs (List) established and maintained by the Small Business Administration (SBA) "and no material changes in ownership and control, principal office, or HUBZone employee percentage have occurred since it was certified in accordance with 13 CFR Part 126," *id.* at 242–43, 251; FAR 52.212–

3(c)(9)(i) (2010) (as amended by 75 Fed.Reg. 82,568 (Dec. 30, 2010), effective Jan. 12, 2011), 52.219–1(b)(6)(i) (2010) (as amended by 75 Fed.Reg. 77,732 (Dec. 13, 2010), effective Jan. 12, 2011). Proposals in response to the Solicitation were due on April 27, 2011. AR 147 (Solicitation).

Plaintiff contends that "CSI was and is a qualified offeror/bidder who timely submitted its [P]roposal in response to the subject Solicitation." Compl. ¶ 22; *see also id.* ¶ 28. CSI has performed maintenance services for nearly twenty years at Fort Riley and, for the past several years, has provided direct support for the logistics supply function at Fort Riley. Compl. ¶¶ 9–10; *see* AR 9 (Acquisition Docs.) (identifying CSI as the current contractor for logistics support services at Fort Riley). CSI's Proposal stated that CSI was certified as a Service Disabled Veteran Owned Small Business Concern (SDVOSBC), AR 1166 (Proposal), and that its corporate headquarters—Junction City, Kansas—was located in a HUBZone, *id.* at 1170.

Although CSI was, as of the date of the filing of its Complaint, certified as a qualified HUBZone SBC, *see* Pl.'s TRO Memo. 5, CSI did not obtain certification from the SBA—and thus did not appear on the List established and maintained by the SBA—until after CSI had submitted its Proposal, AR 1568.2 (Pl.'s GAO Resp.); Pl.'s Mot. 19; *see also* AR 1170 (Proposal) (explaining CSI's certification history); *infra* Part I.C (same). Because CSI did not meet this requirement of the Solicitation, the Army did not evaluate

---

**8.** A HUBZone is defined as an area located within one or more of the following: qualified non-metropolitan counties; qualified census tracts; lands within the boundaries of an Indian reservation; redesignated areas; or base closure areas. 15 U.S.C. § 632(p)(1) (2006); *see* 13 C.F.R. § 126.103 (2011) (defining these areas); *cf. infra* n. 10 (noting that the court cites to the version of the Code of Federal Regulations (C.F.R.) in effect at the time the Solicitation was issued).

**9.** A business is considered a small business concern (SBC) if it is "independently owned and operated[,] ... is not dominant in its field of operation" and meets certain size standards as determined by the Administrator of the Small Business Administration (SBA). 15 U.S.C. § 632(a)(1)–(2); *cf.* 13 C.F.R. §§ 121.101–1103

(2011) (setting forth the SBA's small business size regulations).

**10.** The Army issued the Solicitation on March 23, 2011, AR 147 (Solicitation), and the court cites to the versions of the C.F.R. and the Federal Acquisition Regulations (FAR) that were in effect at the time, *see Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed.Cl. 1, 9 n. 14 (2007) ("The court cites to the versions of the FAR and the Code of Federal Regulations ostensibly in effect at the time the Army issued the solicitation...."); *Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571, 580 (2000) ("Any new bidding process would be in accord with the publicly available ... regulations in effect at the time the RFP was issued....").

CSI's Proposal. Def.'s Mot. 2, 5–6. Plaintiff argues that the Army's decision not to consider CSI's Proposal was a violation of law and that, had the Army evaluated CSI's Proposal, it would have awarded the Solicitation to CSI. Compl. ¶¶ 42, 50. Plaintiff maintains that "the Army's exclusion of CSI from competition was a result of its interpretation and application of an SBA rule [that] contradicts the enabling statute in that it is . . . far more restrictive than the enabling statute clearly and specifically provides." Pl.'s TRO Memo. 2.

The enabling statute referred to by CSI is the Small Business Reauthorization Act of 1997 (HUBZone Act), Pub.L. No. 105–135, §§ 601–07, 111 Stat. 2592, 2627–36 (codified as amended at 15 U.S.C. §§ 637, 657a (2006) and other scattered sections of Chapter 14A of Title 15), which established the HUBZone program within the SBA. The HUBZone Act charged the SBA with administering the HUBZone program. 15 U.S.C. § 657a(a); *see Mission Critical Solutions v. United States,* 96 Fed.Cl. 657, 662 (2011). The SBA promulgated implementing regulations in 1998. 13 C.F.R. §§ 126.100–.900 (2011). A brief review of the HUBZone Act follows.

### B. The HUBZone Act

"Congress enacted the HUBZone Act . . . to create a new category of entities for which the President was directed to 'annually establish [a] Government-wide goal[ ] for procurement contracts awarded.'" *Diversified Maint. Sys., Inc. v. United States (Diversified),* 74 Fed.Cl. 122, 123 n. 3 (2006) (brackets in original) (quoting 15 U.S.C. § 644(g)(1)). "The purpose of the HUBZone program is to provide federal contracting assistance for qualified SBCs located in historically underutilized business zones in an effort to increase employment opportunities, investment, and economic development in such areas." 13 C.F.R. § 126.100; *see also Diversified,* 74 Fed.Cl. at 123 n. 3. A qualified HUBZone SBC may be awarded federal contracts on a sole-source basis, 15 U.S.C. § 657a(b)(2)(A), through competition restricted to HUBZone SBCs, *id.* § 657a(b)(2)(B), or through a ten percent pricing preference on the basis of full and open competition, *id.*

§ 657a(b)(3)(A). To be eligible for the HUBZone program, a contractor must be considered a qualified HUBZone SBC. *Id.* § 657a(a), (b)(2)–(3).

An SBC must meet one of several of definitions set forth by 15 U.S.C. § 632(p)(3) to be considered a HUBZone SBC. 15 U.S.C. § 632(p)(3). For example, an SBC "that is at least 51 percent owned and controlled by United States citizens" is considered a HUBZone SBC. *Id.* § 632(p)(3)(A). Section 632(p)(5)(A) dictates the conditions under which a HUBZone SBC will be considered a "qualified" HUBZone SBC: "A HUBZone [SBC] is 'qualified', if—(i) the [SBC] has certified in writing to the Administrator (or the Administrator otherwise determines, based on information submitted to the Administrator by the [SBC], or based on certification procedures, which shall be established by the [SBA] by regulation) that" it is a HUBZone SBC that meets certain conditions; the SBC will attempt to maintain the applicable employment percentage; and the SBC will ensure certain conditions exist "with respect to any subcontract entered into by the [SBC]." *Id.* § 632(p)(5)(A)(i). Section 632(p)(5)(A) also requires that "(ii) no certification made or information provided by the [SBC] under clause (i) has been, in accordance with the procedures established under [15 U.S.C. § 657a(c)(1) ]—[ ] successfully challenged by an interested party; or [ ] otherwise determined by the Administrator to be materially false." *Id.* § 632(p)(5)(A)(ii). The SBA regulations provide that "SBA certification is the only way to qualify for HUBZone program status." 13 C.F.R. § 126.301.

"[O]nce the Administrator has made the certification required by subparagraph (A)(i) regarding a qualified HUBZone [SBC] and has determined that subparagraph (A)(ii) does not apply to that concern," the Administrator must add the SBC to the List of qualified HUBZone SBCs. *See* 15 U.S.C. § 632(p)(5)(D)(i); 13 C.F.R. § 126.300 ("If SBA determines that the concern is a qualified HUBZone SBC, it will issue a certification to that effect and add the concern to the List."). The List must "include the name, address, and type of business" of each quali-

fied HUBZone SBC. 15 U.S.C. § 632(p)(5)(D)(i). Further, the Administrator must update the List "not less than annually" and must provide the List "upon request to any Federal agency or other entity." *Id.* § 632(p)(5)(D)(ii)–(iii). The FAR provides that "[o]nly firms on the [L]ist are HUBZone [SBCs], eligible for HUBZone preferences." FAR 19.1303(b).

## C. CSI's HUBZone Status

CSI was originally certified as a Qualified HUBZone SBC on April 13, 1999. *See* AR 1170 (Proposal). However, on March 5, 2006 CSI was decertified[11] because of changes in unemployment statistics in the county in which CSI was located.[12] *See id.;* Pl.'s TRO Memo. 5 n. 2. Plaintiff claims that, "[b]y the time CSI was made aware of this, its [c]ounty was once again a HUBZone, and as CSI had undergone no changes to the company's HUBZone qualifications, CSI began attempting to re-establish its 'certified' status." Pl.'s TRO Memo. 5 n. 2.

The Administrative Record includes a series of e-mails that provide some information concerning CSI's decertification and its "attempt[s] to re-establish its 'certified' [HUBZone] status."[13] Pl.'s TRO Memo. 5 n. 2; *see* AR 1100–1117 (e-mails). The e-mails indicate that, on March 5, 2006, the SBA decertified CSI but failed to notify CSI of its change in status. AR 1100 (May 2 e-mail from Mr. Parker to Ms. Pardo), AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger). CSI did not become aware of its decertification until late 2008. AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger). Given that CSI had been decertified for over two years, the SBA advised CSI to submit a HUBZone certification application—rather than seek recertification. *See id.;* AR 1100 (May 2 e-mail from Mr. Parker to Ms. Pardo); *cf.* AR 1101 (Apr. 29 e-mail from Ms. Pardo to Mr. Lloyd) ("CSI is not a HUBZone SBC and as such the recertification process cannot be applied to it."); 13 C.F.R. § 126.309 (providing that an SBC has ninety days to seek certification after it has been decertified by the SBA). Following this advice, in December 2008, CSI re-applied for HUBZone certification. AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger). The SBA informed CSI that the application process would take approximately thirty days; however, CSI's certification application experienced significant processing delays. *Id.;* AR 1100 (May 2 e-mail from Mr. Parker to Ms. Pardo).

In January 2010—thirteen months after CSI submitted its HUBZone certification application—CSI received notification that its application had been denied. AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger); AR 1100 (May 2 e-mail from Mr. Parker to Ms. Pardo). "[T]he reason for the denial was due to [CSI's] home office locations outside of Junction City, KS." AR 1100 (May 2 e-mail from Mr. Parker to Ms. Pardo). Due to a mandatory twelve-month waiting period between

---

11. "De-certify means the process by which SBA determines that a concern is no longer a qualified HUBZone SBC and removes that concern from its List." 13 C.F.R. § 126.103.

12. CSI's response to the Solicitation (Proposal) states the following with respect to its 2006 decertification:

We were surprised by the change, due to not receiving prior notification of any pending change. Additionally, during this time[,] [CSI] did not experience any changes, either material or immaterial. To be clear, we did not have a change in ownership, we did not have a change in structure, we did not have a change in the principal office and we continued to me[e]t or exceed the Hubzone 35% residency requirement.
AR 1170 (Proposal).

13. The relevant parties to the e-mails include the following: the President and CEO of CSI, Lloyd Parker (Mr. Parker); SBA's Deputy Director of the HUBZone Program, Mariana Pardo (Ms. Pardo); the Chief Financial Officer of CSI, George Rogers (Mr. Rogers); the Director of the Army's Office of Small Business Programs, Tracey Pinson (Ms. Pinson); the Assistant to the Director of the Army's Office of Small Business Programs, James Lloyd (Mr. Lloyd); the Contracting Officer, Christopher M. Toste (Mr. Toste); the Contract Specialist, Edward Sido (Mr. Sido); and Constituent Services Representative to Congressman Tim Huelskamp, Lynn Ballinger (Ms. Ballinger). *See* AR 1100–17 (e-mails). When citing to the e-mails, the court identifies the date and author of the e-mail. Because all of the e-mails were written in 2011, *see id.,* the court omits the year from the citations.

HUBZone application submissions, CSI could not reapply for certification until February 2011,[14] *see id.;* AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger)—a month before the Army issued the Solicitation, AR 147 (Solicitation).

On April 26, 2011—the day before proposals were due, AR 147 (Solicitation)—Mr. Parker sent the SBA's Deputy Director of the HUBZone Program, Ms. Mariana Pardo, an e-mail requesting that the SBA temporarily exempt CSI from the HUBZone certification requirement: "[W]e are asking that you make an exception with our application, given what transpired was completely [outside] of our control." AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger); *accord* AR 1104 (Apr. 26 e-mail from Mr. Rogers to Ms. Pinson) ("We are in need of assistance in requesting that the Administrators over [at] the HUBZone Program allow CSI an immediate exception and re[-]instate its HUBZone certification, so [CSI's] proposal as the follow[-]on contractor at Fort Riley could be evaluated."). Although CSI had not yet received HUBZone certification from the SBA and did not appear on the SBA's List, *see* AR 1568.2 (Pl.'s GAO Resp.); *see* AR 1170 (Proposal) (stating that CSI is "confident that CSI will regain its HUBZone certification before the actual award date"), CSI submitted its Proposal on April 27, 2011, *see* AR 1155 (Proposal).

On May 2, 2011 the Contracting Officer (CO) responsible for the Solicitation, Mr. Toste, e-mailed Mr. Parker to inform him that CSI's Proposal would not be evaluated. AR 1112 (May 2 e-mail from Mr. Toste to Mr. Parker); *cf.* AR 146 (Solicitation) (identifying Mr. Toste as the CO). Mr. Toste cited an e-mail he had received from the SBA, which stated that—under FAR 19.1303(d) and 13 C.F.R. § 126.601(b)—a HUBZone SBC must be certified at the time it submits its proposal. AR 1112 (May 2 e-mail from Mr. Toste to Mr. Parker). Mr. Toste's e-mail concluded with the following: "Due to the regulatory requirements, as advised by SBA, your proposal will not be able to be

evaluated since you did not have your HUBZone certification at the time of submission of your initial proposal. Unless otherwise instructed I will return your proposal via FedEX." *Id.*

In his reply to Mr. Toste's e-mail, Mr. Parker stated that he had received guidance from the SBA that CSI needed to obtain HUBZone certification prior to the award date. AR 1111 (May 2 e-mail from Mr. Parker to Mr. Toste); *accord* AR 1100–01 (May 2 e-mail from Mr. Parker to Ms. Pardo) ("We were advised (I made the call myself) that our company needed to be certified by the AWARD DATE of the procurement opportunity."); AR 1107 (June 27 e-mail from Mr. Parker to Mr. Sido) ("SBA committed to back dating the [HUBZone certification] letter to coincide with the [Solicitation]."); AR 1117 (Aug. 9 e-mail from Mr. Parker to Mr. Toste) ("[T]he guidance we received from the SBA office was that we needed to be re-certified PRIOR to award date."). In response, Mr. Toste explained he had "sought specific guidance from the SBA on this issue and the HUBZone Program Analyst clearly stated that a HUBZone [SBC] must be a qualified HUBZone [SBC] both at the time of its initial offer and at the time of contract award." AR 1111 (May 2 e-mail from Mr. Toste to Mr. Parker). With respect to Mr. Parker's claim that he had received different guidance from the SBA, Mr. Toste stated: "Until we receive, in writing, an official statement from the SBA HUBZone Program that your company should be considered as a HUBZone certified business in accordance with 13 CFR [§ ] 126.601(b) and FAR 19.1303 retroactive to 27 Apr 2011 at 1600 hrs, we are unable to evaluate your proposal." *Id.*

Although there is no support for plaintiff's contention in the AR, plaintiff contends in its Complaint that the Army accepted the advice of the SBA—"that if [CSI] were certified by the time of the award, the certification would relate back and include the proposal date." Compl. ¶¶ 24–25; *see also id.* ¶ 26 ("[T]he

---

14. The April 26, 2011 e-mail states that CSI "started the process again in February 2001." AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger). The court under-

stands "2001" to be a typographical error and that CSI actually restarted the process in February 2011.

Army did not require offerors to be certified by the SBA and named on SBA's 'list' on the date their proposal was submitted."); Pl.'s TRO Memo. 5 (claiming that "the Government accepted the SBA's advice" and that "CSI understood from both the SBA and the Government that it needed to be certified by the SBA prior to the date of the award"). "Thus, while th[e] Solicitation was pending and during the approximately three months which passed after closing and before award, CSI made every attempt to expedite the SBA's certification process...." Compl. ¶ 25. On June 24, 2011—after the April 27, 2011 closing date of the Solicitation but before the award—the SBA notified CSI that its application had been accepted and that it was certifying CSI as a qualified HUBZone SBC. *See* Pl.'s TRO Memo. 5; AR 1551 n. 2 (Def.'s GAO Mot.).

### D. Procedural History

The Army awarded Contract Number W9124J–11–C–0019 (Contract) to FedServices [15] on August 16, 2011, AR 1496 (Army Memo.), and CSI requested a debriefing eight days later, Compl. ¶ 34. Before the Army could respond, plaintiff withdrew the debriefing request and filed a protest with the Government Accountability Office (GAO) on August 31, 2011. *Id.* ¶¶ 34–35; *see also* AR 1520 (GAO Protest Materials). CSI protested the award to FedServices on the grounds that "the Government's evaluation of CSI's and FedServices' proposals, and its award decision, were unreasonable; lacked a rational basis; were not in accord with the RFP's stated evaluation and source selection criteria; and were contrary to applicable Federal procurement law an[d] policy." AR 1523 (Pl.'s GAO Protest).

On September 26, 2011 the Army moved to dismiss CSI's protest on the ground that CSI was not an interested party because "it would not be in line for award if the protest were sustained." AR 1550–52 (Def.'s GAO Mot.). The Army maintained that both the

Solicitation and 13 C.F.R. § 126.601(c) require that offerors be certified as HUBZone SBCs at the time they submit their proposal. *Id.* at 1552. The Army stated that "[a] HUBZone SBC is considered to be certified if the [SBA] determines that a HUBZone SBC is qualified for the HUBZone program and entitled to be included in SBA's 'List of Qualified HUBZone SBCs." *Id.* (citing 13 C.F.R. § 126.103(4)); *cf. supra* Part I.B (discussing the SBA's List). Because CSI "was not a certified HUBZone SBC at the time it submitted its [P]roposal," the Army argued that "the Agency reasonably and properly excluded [CSI's] [P]roposal from award consideration." AR 1553 (Def.'s GAO Mot.).

In its response to the Army's motion to dismiss, CSI argued that the requirement in the SBA regulations that HUBZone SBCs be *certified* at the time of offer is contrary to the requirement in the Small Business Act that HUBZone SBCs be *qualified* at the time of offer. AR 1568.2 (Pl.'s GAO Resp.). According to CSI, the Small Business Act "allows CSI to compete on solicitations set aside for qualified HUBZone SBCs so long as it was qualified as a HUBZone [SBC], and that it had certified to SBA at that time that it was, in fact, qualified as a HUBZone SBC." *Id.* CSI also argued that the Small Business Act law does not require SBCs, which are otherwise qualified as HUBZone SBCs, to first obtain admittance to the SBA's List. *Id.* at 1568.4. CSI concluded that "but for contradictory SBA and FAR regulations that require a concern be added to this 'qualified list' before it can bid [on] HUBZone set-aside projects, CSI would clearly be eligible, and an interested party, in the subject procurement." *Id.* at 1568.5.

On September 30, 2011 the GAO dismissed plaintiff's protest, finding that CSI was "effectively challeng[ing] the SBA's interpretation and implementation of its regulations with regard to an area over which the SBA has exclusive authority." AR 1573 (Sept. 30,

---

15. A contract was originally awarded to DA Defense Logistics HQ, LLC (DA Defense Logistics) on July 29, 2011. AR 1466 (Army Memo.). The government soon discovered, however, that DA Defense Logistics was not a qualified HUBZone SBC in accordance with 13 C.F.R. § 126.601(c)

and FAR 19.1303(d). *Id.* The government rescinded the contract with DA Defense Logistics, and "the source selection process remained in effect." *Id.* FedServices was "[t]he next highest rated acceptable offeror." *Id.*

2011 GAO Decision). The GAO held that it lacked jurisdiction to hear CSI's protest and that CSI was not an interested party. *Id.* On January 17, 2012 the GAO declined plaintiff's request to reconsider its decision. AR 1587–88 (Jan. 17, 2012 GAO Decision).

On January 25, 2012 plaintiff filed its Complaint in this court seeking declaratory and injunctive relief. Compl. ¶ 1; *see generally id.* Plaintiff requests the court to declare that the award to FedServices was unlawful, *id.* ¶ 53, and to order the Army to rebid the Solicitation, *id.* at 9. Plaintiff also requests that the court "[p]ermanently enjoin the Army from illegally, arbitrarily and capriciously denying CSI the opportunity to compete on the Solicitation." *Id.* at 9.

## II. Legal Standards

### A. Jurisdiction

■ The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b)(1), affords the United States Court of Federal Claims (Court of Federal Claims) jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] ... [regardless of] whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). A plaintiff therefore does not have standing to bring a protest action in this court unless it is an "interested party." *See id.; GTA Containers, Inc. v. United States,* 103 Fed.Cl. 471, 479–80 (2012). Because "standing is a jurisdictional requirement, a protestor's failure to establish standing precludes a ruling on the merits." *Sci. Applications Int'l Corp. v. United States,* 102 Fed.Cl. 644, 650 (2011) (internal quotation marks omitted); *see also Labatt Food Serv., Inc. v. United States (Labatt Food ),* 577 F.3d 1375, 1378 (Fed.Cir.2009) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." (internal quotation marks omitted)).

■ To show that it is an "interested party" within the context of § 1491(b)(1), a plaintiff must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006); *see also Am. Fed'n of Gov. Emps. Local 1482 v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (defining an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). To establish that a plaintiff's "direct economic interest" is affected in the post-award bid protest context, a plaintiff "must show it would have been 'a qualified bidder,' i.e., that it had a 'substantial chance' of being awarded the contract." *See Microdyne Outsourcing, Inc. v. United States,* 72 Fed.Cl. 230, 232 (2006) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370–71 (Fed.Cir. 2002)); *see also Brooks Range Contract Servs., Inc. v. United States (Brooks Range),* 101 Fed.Cl. 699, 713 (2011) ("A finding of standing in a post-award bid-protest case requires that the protestor have a 'substantial chance' to obtain the cont[r]act if the alleged errors are found to exist."). Stated differently, a plaintiff must show that it has been prejudiced by the alleged error in the government procurement process—that "but for the error, it would have had a substantial chance of securing the contract." *Labatt Food,* 577 F.3d at 1378; *see also Brooks Range,* 101 Fed.Cl. at 706 ("[A] protestor must demonstrate how an alleged error by the government would result in 'particularized harm' to the protestor.").

### B. Motion for Judgment on the Administrative Record

Motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). *See* RCFC 52.1(c). "A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment." *Mission Critical*

*Solutions v. United States,* 91 Fed.Cl. 386, 394 (2010) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir.2005)) (enforcement denied by 104 Fed.Cl. 18 (2012)); RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record."). When evaluating cross-motions for judgment on the administrative record, the court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DMS All–Star Joint Venture v. United States,* 90 Fed.Cl. 653, 661 (2010) (citing *Bannum,* 404 F.3d at 1356–57). "The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding." *CRAssociates, Inc. v. United States,* 102 Fed.Cl. 698, 710 (2011) (citing, inter alia, *Bannum,* 404 F.3d at 1356).

"The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases." RCFC 52.1 Rules Committee Note (2006). Here, the standards of review and burdens of proof and persuasion are set by the Administrative Procedure Act (APA) as interpreted and applied in binding precedent. *See* 28 U.S.C. § 1491(b)(4); *infra* Part II.C.

### C. Standard of Review

■ The court reviews a bid protest action under the standards set forth in the APA at 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). The APA provides that an agency's decision shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004). In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*

*(Impresa* ), 238 F.3d 1324, 1332 (Fed.Cir. 2001). "[T]his standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" *CRAssociates,* 102 Fed.Cl. at 710 (second brackets in original) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

■ CSI's bid protest is based upon an alleged violation of law. *See* Compl. ¶¶ 28, 46; Pl.'s Mot. 17. When a plaintiff challenges a procurement on this ground, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa,* 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)); *cf. Brooks Range,* 101 Fed.Cl. at 707 ("In order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that the error was prejudicial."). "In pre-award protests, the protester can establish prejudice by showing 'a non-trivial competitive injury which can be redressed by judicial relief.'" *DGR Assocs., Inc. v. United States (DGR),* 94 Fed.Cl. 189, 199 (2010) (quoting *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1361 (Fed.Cir.2009)). In post-award bid protests, however, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum,* 404 F.3d at 1353 (citing, inter alia, *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003)); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999). "[A] protestor is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

### D. Motions to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim

In this case, defendant has also moved the court to dismiss plaintiff's protest for a lack of subject matter jurisdiction, which is gov-

erned by RCFC 12(b)(1), and for a failure to state a claim upon which relief can be granted, which is governed by RCFC 12(b)(6). Def.'s Mot. 7–14; *cf.* RCFC 12(b)(1), (6). When ruling on a motion to dismiss under RCFC 12(b)(1), the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995). "The non-moving party bears the burden of establishing jurisdiction by a preponderance of evidence." *DGR,* 94 Fed.Cl. at 199 (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988)). The court may consider evidence outside of the parties' pleadings to resolve jurisdictional factual disputes. *See id.; Outdoor Venture Corp. v. United States,* 100 Fed.Cl. 146, 150 (2011). If the court determines that jurisdiction is lacking, "the court must dismiss the action." RCFC 12(h)(3).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal (Iqbal),* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly (Twombly),* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When ruling on a 12(b)(6) motion to dismiss, the court "must accept as true all the factual allegations in the complaint" and make "all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Generally, bid protests are addressed under Rule 52.1 as a decision on the administrative record. *See* RCFC 52.1(c). The court does not perceive that defendant's motions will assist the court in achieving "the just, speedy, and inexpensive determination" of this action,[16] RCFC 1; *cf.* 28 U.S.C.

§ 1491(b)(3) (stating that the court "shall give due regard to … the need for expeditious resolution of the action"), and therefore addresses and decides only the parties' cross-motions for judgment on the administrative record.

### III. Discussion

#### A. Plaintiff Is an Interested Party and Therefore Has Standing to Bring this Bid Protest

■ The court is satisfied that CSI is an interested party within the context of 28 U.S.C. § 1491(b)(1) and therefore has standing to bring this bid protest action. *See* 28 U.S.C. § 1491(b)(1). That is, the court finds that CSI is an actual or prospective bidder and possesses a direct economic interest in the award of the Contract. *See Rex Serv. Corp.,* 448 F.3d at 1307.

It is undisputed that CSI is an actual bidder and therefore meets the first prong of the interested party test. *See* Def.'s Mot. 9 n. 7 (conceding this point); *cf. Orion Tech., Inc. v. United States,* 102 Fed.Cl. 218, 226 (2011); *Chenega Mgmt., LLC v. United States (Chenega),* 96 Fed.Cl. 556, 571 (2010). Whether CSI meets the second prong of the interested party test—which requires an examination of whether CSI had a substantial chance of receiving the award, *see Rex Serv. Corp.,* 448 F.3d at 1308—requires a more detailed analysis.

Although CSI's Proposal was not evaluated by the Army, Def.'s Mot. 2, 6, it is well-established that, in a post-award bid protest, "an offeror eliminated from the competitive range is not necessarily precluded from establishing standing as an interested party," *Chenega,* 96 Fed.Cl. at 571; *see also Esterhill Boat Serv. Corp. v. United States (Esterhill),* 91 Fed.Cl. 483, 486 (2010). "The court must consider why the [offeror] was eliminated." *Esterhill,* 91 Fed.Cl. at 486. If the offeror can establish that, but for the alleged procurement errors it could compete for the

---

16. For example, defendant's motion to dismiss under RCFC 12(b)(1) is based on a characterization of plaintiff's proposal as containing a lie. Def.'s Mot. 7–10. It is true that plaintiff's proposal contains untruths. *See* Oral Argument of Mar. 21, 2012 (Colloquy between the court and

Ms. Leslie Boe) at 10:16:40–17:31 (conceding that certain representations in plaintiff's Proposal were "not correct"). However, these untruths are not such that they would necessarily disqualify CSI from the evaluation process. *Cf. infra* n. 17.

contract, the offeror has standing. *See Impresa*, 238 F.3d at 1334 (finding that the appellant had standing where, assuming appellant's protest was successful, the appellant had a substantial chance of being awarded the government's re-solicitation of the contract); *Watterson Constr. Co. v. United States*, 98 Fed.Cl. 84, 89–90 (2011) (finding that, but for the government's alleged improper elimination of the plaintiff's proposal for being untimely, the plaintiff had a substantial chance of being awarded the contract). The issue here, then, is whether CSI would have a substantial chance of receiving the award if the court finds in favor of CSI and the Army is obligated to re-solicit the contract. *See Esterhill*, 91 Fed.Cl. at 486 ("If the allegations are correct and the Government were obligated to rebid the contracts, plaintiff could win with resubmitted proposals.").

CSI contends that, but for the Army's alleged violation of the Small Business Act—which, plaintiff contends, does not require offerors to appear on the SBA's List of qualified bidders at the time of submission of proposals—CSI had a substantial chance of receiving the award. *See* Pl.'s Mot. 16; *id.* at 17 ("Had the Government followed the law, it would not have excluded CSI from the competition."); *cf. id.* at 15 ("[T]he Army's action in failing to consider CSI's bid is the very thing which CSI challenges as unlawful . . . ."). The Solicitation provided that "proposals will be evaluated under three evaluation factors: Mission Capability, Past Performance, and Price," AR 229 (Solicitation), where Mission Capability would be considered more important than Past Performance and Past Performance would be considered more important than Price, *id.* at 230. The Solicitation further provided that "all non-price evaluation factors when combined are significantly more important than price," *id.*, and that price would be used primarily to determine price reasonableness, *id.* at 238.

The awardee, FedServices, received [* * *] for Mission Capability, [* * *] rating for Past Performance and had an estimated price of [* * *]. AR 1473–74 (Price Negotiation Memo.). Given that CSI is the incumbent contractor currently performing many, if not most or all, of the services that are the subject of the Solicitation, Compl. ¶¶ 3, 9–10; *see also* Pl.'s TRO Memo. 2, the court finds it reasonable to infer that the Army would have given CSI ratings that could have been competitive with FedServices' ratings in the Mission Capability and Past Performance factors, *see* Pl.'s Mot. 8–10; Compl. ¶¶ 29, 31–32. With respect to the Price factor, the court also finds that the Army could have considered reasonable CSI's estimated price of [* * *]. *See* AR 1214 (Proposal); Pl.'s Mot. 10. Given the foregoing, were the court to sustain CSI's protest and the Army were obligated to rebid the solicitation, the court finds that CSI would have a substantial chance of receiving the award.

Because CSI is an actual bidder and possesses a direct economic interest in the award of the Contract, *see Rex Serv. Corp.*, 448 F.3d at 1307, CSI is an interested party under 28 U.S.C. § 1491(b)(1).[17] CSI there-

---

17. Defendant argues that CSI lacks a direct economic interest in the award because CSI falsely certified in its proposal that it was on the SBA's List of qualified HUBZone SBCs. Def.'s Mot. 9; *see also id.* ("The Army is not going to award a contract to an offeror that made false representations about its HUBZone status."). Defendant cites to FAR 9.104–1(d), which requires responsible offerors to "[h]ave a satisfactory record of integrity and business ethics," and *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1339 (Fed.Cir.2001), in which the United States Court of Appeals for the Federal Circuit (Federal Circuit) stated that "a contracting officer should consider disqualifying a proposed contractor if a material misrepresentation is made," *see* Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss, Mot. for J. upon the AR, & Resp. in Opp'n to Pl's Mot. for J. upon the AR (defendant's Reply or Def.'s Reply), Dkt. No. 21, at 4; Def.'s Mot. 9. Plaintiff's counsel argues, and the court agrees, that "one cannot read the checkmark boxes on pages 1179 [or] 1187 [in the AR] in isolation or in a vacuum; they are part of a whole document—the proposal," which includes the Exceptions/Assumptions section of the proposal. Oral Argument of Mar. 21, 2012 (Argument of Ms. Leslie Boe) at 10:18:40–49; *cf. infra* Part III.B (discussing the inaccuracies in CSI's Proposal).

Subpart 9.100 of the FAR "prescribes policies, standards, and procedures for determining whether prospective contractors and subcontractors are responsible." FAR 9.100. The regulations state that "[n]o purchase or award shall be made unless the contracting officer makes an

fore has standing to bring this protest.[18]

## B. CSI Has Waived Its Right to Challenge the Solicitation's Evaluation Methodology

█ Although CSI has standing to bring its protest before the court, the court finds that, pursuant to the waiver rule recognized in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313–14 (Fed.Cir.2007), CSI has waived its right to challenge the Solicitation requirement that offerors appear on the SBA's List of qualified HUBZone SBCs at time of submission of offers. Accordingly, the court must dismiss plaintiff's protest as untimely. *See id.* at 1316.

*Blue & Gold Fleet*, a pre-award bid protest, involved a solicitation for the provision of ferrying services to Alcatraz Island. *Id.* at 1310–11. The protestor challenged the government's failure to apply the wage and benefits provisions of the Service Contract Act, 41 U.S.C. §§ 351–358 (now codified as amended at 41 U.S.C. §§ 6702–07), to the solicitation, which—according to the protestor—led to the government's erroneous determination that the awardee's proposal was

financially viable, *see Blue & Gold Fleet*, 492 F.3d at 1312. The United States Court of Appeals for the Federal Circuit (Federal Circuit) found that, although couched as a challenge to the government's evaluation of the awardee's proposal, the protest was, in fact, a "challenge to the terms of the solicitation." *Id.* at 1313.

The Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.; see also id.* ("[W]here a government solicitation contains a patent ambiguity, the government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government." (internal quotation marks omitted)). According to the Federal Circuit, recognition of a waiver rule in bid protests "prevents contractors from taking advantage of the government and other bid-

---

affirmative determination of responsibility." FAR 9.103(a). To be determined responsible, prospective contractors must, among other requirements, "[h]ave a satisfactory record of integrity and business ethics." FAR 9.104-1(d). If a contracting officer determines that an SBC is non-responsible, "the contracting officer shall refer the matter to the [SBA], which will decide whether to issue a Certificate of Competency." FAR 9.104-3(d)(1). "Should the SBA issue the Certificate of Competency, the small business is conclusively deemed responsible for the purposes of the procurement in question." *PlanetSpace, Inc. v. United States*, 92 Fed.Cl. 520, 546 (2010) (citing FAR 19.601(a)–(b)).

Defendant appears to argue that, were the court to sustain CSI's bid protest, the SBA would ultimately refuse to issue CSI a Certificate of Competency, so that CSI would lack standing. *See* Def.'s Reply 4; Def.'s Mot. 9. That is, the court must infer that the contracting officer would find that, because CSI affirmatively represented in its proposal that it was on the SBA's List, CSI has an unsatisfactory record of integrity and business ethics and is therefore not responsible, *see* FAR 9.104-1(d)—notwithstanding CSI's detailed explanation of its HUBZone status in the Exceptions/Assumptions section of the proposal, *see* AR 1170–71 (Proposal). Because CSI is an SBC, Compl. ¶¶ 6, 8; Pl.'s TRO Memo. 3; *see also* AR 1060, 1069 (Online Representations and Certifications Application (ORCA)) (certifying

that was an SBC as of April 27, 2011), the contracting officer's non-responsibility determination renders the matter reviewable by the SBA. FAR 9.104-3(d)(1). Again, notwithstanding the explanation put forth in the Exceptions/Assumptions section of CSI's proposal, the court—under defendant's assumptions—must infer that the SBA would then decide not to issue CSI a Certificate of Competency. *See id.;* FAR 19.601(a)–(b). Defendant's argument does not require a finding that plaintiff lacks standing.

**18.** The court reaches this conclusion without the need to consider evidence outside of the parties' pleadings. *See Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed.Cl. 1, 4 (2007) ("The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction."). Accordingly, the court does not address the affidavits of Lloyd J. Parker, Jr. or Crystal Hanson, which are attached to plaintiff's Memorandum in Response to the United States' Motion to Dismiss[,] Cross–Motion for Judgment upon the Administrative Record and Contract Services, Inc.'s Reply to Defendant's Response in Opposition to Contract Services, Inc.'s Motion for Judgment on the Administrative Record (plaintiff's Response or Pl.'s Resp.), Dkt. No. 20, as Exhibits A and B, respectively, or the declaration of Edward T. Sido, which is attached to defendant's Reply.

ders, and avoids costly after-the-fact litigation." *Id.* at 1314. The court found that "the statutory mandate of [28 U.S.C] § 1491(b)(3) for courts to 'give due regard to . . . the need for expeditious resolution of the action' and the rationale underlying the patent ambiguity doctrine favor recognition of a waiver rule." *Id.* at 1315 (quoting 28 U.S.C. § 1491(b)(3)); *see also id.* at 1314–15 (evoking the "analogous doctrines of laches and equitable estoppel"). The Federal Circuit, observing that " '[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm,' " *id.* (second alteration in original) (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed.Cl. 167, 175 n. 14 (2005)), affirmed the trial court's decision to grant defendant's and defendant intervenor's motions for judgment on the administrative record,[19] *id.* at 1310–11.

Defendant argues that, "[b]y claiming that the [SBA regulations] conflict with the Small Business Act," CSI is "us[ing] the regulations as a proxy to attack the [S]olicitation's requirement[s]." Def.'s Mot. 12. As defendant contends, plaintiff simply ignores the Solicitation's inclusion of FAR 52.212–3 and 52.219–1, which require offerors to certify that they appear on the SBA's List at time of submission. *Id.* at 4–5, 10 (citing AR 243, 251). Rather than making a timely objection to the Solicitation's requirement that an offeror's proposal—when submitted—contain a representation that the offeror then appears on the SBA's List of qualified HUBZone SBCs, defendant contends that "CSI elected to roll the dice and submit its proposal anyway." *Id.* at 13. Defendant argues that CSI's protest is untimely and therefore its objection to the terms of the Solicitation is forfeited under the standards set out in *Blue & Gold Fleet. Id.* at 11; *cf. id.* at 12 (stating

that CSI had ample opportunity to challenge the Solicitation given that "the Army solicited questions from industry, created an extensive list of answers to the questions that it did receive, and twice amended the [S]olicitation").

Plaintiff contends that the Solicitation does not, in fact, require offerors to appear on the SBA's List at the time of submission. Pl.'s Resp. 14; *see also id.* at 6 ("[N]othing in the Solicitation states, or even implies, that [an] offeror's status would be measured by their presence on the SBA List."). With respect to the Solicitation's inclusion of FAR 52.212–3 and 52.219–1, plaintiff claims that these clauses contain several paragraphs that simply "require[ ] the offeror to certify either affirmatively or negatively, about their status as to numerous small disadvantaged business categories, such as whether the company is a veteran-owned [SBC]." *Id.* at 17–18; *see also id.* at 6 n. 2 (noting that FAR 12.301 requires all government solicitations to include FAR 52.212-3, a provision that " 'provides a single, consolidated list of representations and certifications for the acquisition of commercial items' " (quoting FAR 12.301(b)(2))). According to plaintiff, "Nothing in these clauses, nor any other provision in the Solicitation, affirmatively requires that, in order to be eligible for award the offeror must affirmatively check *any* box associated with *any* type of small disadvantaged business concern, much less the box associated with the HUBZone section of these clauses." *Id.* at 18.

■■ The parties' arguments turn on the proper interpretation of the Solicitation. "Interpretation of an agency's solicitation is a question of law for the court." *Linc Gov't Servs., LLC v. United States* (*Linc* ), 96 Fed. Cl. 672, 708 (2010) (citing *Banknote Corp. of Am. v. United States* (*Banknote* ), 365 F.3d 1345, 1353 (Fed.Cir.2004)). The court must

---

**19.** Although defendant raises the waiver argument through a 12(b)(6) motion to dismiss, Def.'s Mot. 10, the court decides this motion as a motion for judgment on the administrative record, RCFC 52.1(c); *see Weston Solutions, Inc. v. United States*, 95 Fed.Cl. 311, 322–24 (2010) (relying on the administrative record in finding that the plaintiff's protest was untimely); *Benchmade Knife Co. v. United States*, 79 Fed.Cl. 731, 737–38

(2007) (same); *Blue & Gold Fleet, L.P. v. United States*, 70 Fed.Cl. 487, 513–14 (2006) (same). The Federal Circuit in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313–14 (Fed.Cir. 2007), "create[d] an equitable . . . bar to a disappointed offeror's untimely challenge to the terms of a government solicitation." *Linc Gov't Servs., LLC v. United States*, 96 Fed.Cl. 672, 698 (2010).

apply the governing principles of contract interpretation, which "apply with equal force to the interpretation of government solicitations." *Id.* The court must begin with the plain language of the solicitation. *Banknote,* 365 F.3d at 1353. "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning...." *Id.* The court must also interpret the solicitation as a whole, "in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.; see also NVT Techs., Inc.,* 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

 Notwithstanding plaintiff's contention that "the only provision within the Solicitation which addresses the time at which the offeror's status is relevant[ ] is [FAR] 52.219–3[ (g) ] which states [that the] offeror must be a HUBZone [SBC] *at the time of award,*" Pl.'s Resp. 18, the court does not interpret FAR 52.219–3(g) as inconsistent with FAR 52.212–3 and 52.219–1. When interpreting an agency regulation, the court applies the rules of statutory construction. *Roberto v. Dep't of the Navy,* 440 F.3d 1341, 1350 (Fed.Cir.2006). The court must begin its analysis of the regulation by "reviewing its language to ascertain its plain meaning." *Am. Airlines, Inc. v. United States,* 551 F.3d 1294, 1299 (Fed.Cir.2008). "The court may consider the language of other, related regulations to guide its analysis." *Mehaffy v. United States,* 98 Fed.Cl. 604, 616 (2011) (citing *Roberto,* 440 F.3d at 1350). Where the provisions relating to a particular subject "are in pari materia," the court employs the "familiar rule of statutory interpretation [that] they must be all construed together and made to harmonize." *See Johnston v. United States,* 37 Ct.Cl. 309, 318 (1902). That is, the court attributes to the SBA "a consistent meaning throughout." *See Alatech Healthcare, L.L.C. v. United States,* 89 Fed.Cl. 750, 753 (2009).

FAR 52.219–3(g) requires offerors to acknowledge "that a prospective HUBZone awardee must be a HUBZone [SBC] at the time of award of this contract," and to provide the CO with notice "if material changes occur before contract award that could affect its HUBZone eligibility." FAR 52.219–3(g) (2010). When read in conjunction with FAR 52.212–3 and 52.219–1, which require offerors to certify that they appear on the SBA's List at time of submission, FAR 52.212–3(c)(9)(i), 52.219–1(b)(6)(i), section 52.219–3(g) serves as an additional requirement that offerors be qualified as HUBZone SBCs *both* at the time of submission, FAR 52.212–3(c)(9)(i), 52.219–1(b)(6)(i), *and* at the time of award, FAR 52.219–3(g); *accord* 13 C.F.R. § 126.601(c) ("A firm must be a qualified HUBZone SBC both at the time of its initial offer and at the time of award in order to be eligible for a HUBZone contract."); FAR 19.1303(d) ("To be eligible for a HUBZone contract under this section, a HUBZone [SBC] must be a HUBZone [SBC] both at the time of its initial offer and at the time of contract award."). If, after submission of its proposal, "material changes occur before contract award that could affect its HUBZone eligibility," the offeror must notify the CO. FAR 52.219–3(g). The foregoing interpretation of FAR 52.219–3(g) "examines and reconciles the text of the entire regulation, not simply isolated sentences." *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1577 (Fed.Cir.1995) (citing *Beecham v. United States,* 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994)).

"Looking at the Solicitation as a whole, in a manner that avoids conflict or surplusage," *Linc,* 96 Fed.Cl. at 710, the court finds that the Solicitation required offerors to be on the SBA's List of qualified HUBZone SBCs at the time of submission of their offers and at the time of award. The Solicitation was a 100% HUBZone set-aside, AR 147 (Solicitation), and FAR 52.212–3(c)(9)(i) and 52.219–1(b)(6)(i) specifically require offerors to certify whether, at the time of submission, they appear on the SBA's List of qualified HUBZone SBCs, AR 239, 242–43 (Solicitation). Among other means, *see* Def.'s Mot. 5, the Army determines through these representations which offerors are qualified HUBZone SBCs eligible for award, *see* Oral Argument of Mar. 21, 2011 (Argument of Mr. Alex Hontos) at 11:02:28–37 ("Here is where the offeror says that I, in fact, am on the

List, and I am a qualified HUBZone [SBC].").

Although plaintiff claims that it is challenging the Army's evaluation of proposals, which—plaintiff contends—was in violation of the Small Business Act, *see* Pl.'s Mot. 12–13, 21–27; Pl.'s Resp. 17, the court finds that plaintiff is challenging the Solicitation's requirement that an offeror must appear on the SBA's List of qualified HUBZone SBCs at the time of submission of its proposal. The requirement that offerors appear on the SBA's List of qualified HUBZone SBCs prior to submission was clear on the face of the Solicitation. AR 239, 242–43 (Solicitation). In fact, the Administrative Record makes clear that CSI was aware of this requirement prior to the submission of its offer and sought from the SBA an "immediate exception" with respect to its certification so its Proposal could be evaluated. *See* AR 1104 (Apr. 26 e-mail from Mr. Rogers to Ms. Pinson). Mr. Rogers, the Chief Financial Officer at CSI, requested that SBA resolve its certification delays by 4:00 p.m. Central Standard Time on April 27, 2011, the date and time that proposals in response to the Solicitation were due. *Id.; see also* AR 1104–05 (Apr. 26 e-mail from Mr. Parker to Ms. Pardo and Ms. Ballinger) (stating that he was informed that CSI had until April 27, 2011 to regain its HUBZone certification).

It is undisputed that, at the time CSI submitted its Proposal, it did not appear on the SBA's List and had not yet been certified by the SBA. *See* Pl.'s Mot. 19; Def.'s Mot. 9–10. Nevertheless, CSI twice checked boxes indicating that it was, in fact, "a HUBZone [SBC] listed, on the date of this representation, on the List of Qualified HUBZone [SBCs] maintained by the [SBA], and no material changes in ownership and control, principal office, or HUBZone employee percentage have occurred since it was certified in accordance with 13 CFR Part 126." AR 1179, 1187 (Proposal). Moreover, in the Executive Summary section of its Proposal, CSI states that it "became HUBZone certified on April 13, 1999" but makes no mention in its

Executive Summary of its subsequent decertification by the SBA. AR 1166 (Proposal); *accord id.* at 1282, 1369 (stating, without qualification, that CSI has "HUBZone Certification"). *But see* Pl.'s TRO Memo. 5 n. 2 (stating that CSI was decertified "[s]ome years" after 1999).

Plaintiff's counsel concedes that the representations made by CSI were "not correct," Oral Argument of Mar. 21, 2012 (Colloquy between the court and Ms. Leslie Boe) at 10:16:40–17:31, but contends that CSI qualifies its answers in the Exceptions/Assumptions section of its Proposal, *id.* at 10:17:55–18:40 (Argument of Ms. Leslie Boe); *cf.* AR 1170–71 (Proposal). The Exceptions/Assumptions section, which immediately follows the Executive Summary section, contains a detailed description of CSI's de-certification history and its attempts to regain HUBZone certification. AR 1170 (Proposal); *cf. supra* Part I.C (discussing CSI's attempts to regain HUBZone certification). CSI explains in this section that it has re-applied for HUBZone certification and that it is "confident that CSI will regain its HUBZone certification before the actual award date." AR 1170 (Proposal). CSI also "take[s] exception to th[e] *solicitation requirement* concerning HUBZone certification," claiming that the time frame associated with certification process is unreasonable.[20] *Id.* at 1170–71 (emphasis added).

Not only is CSI's objection to the Solicitation without merit, its objection has also been waived. Under *Blue & Gold Fleet* CSI had an obligation to challenge the propriety of the Solicitation requirement that offerors appear on the SBA's List prior to submission of their proposals. *See Unisys Corp. v. United States,* 89 Fed.Cl. 126, 137–39 (2009) (finding that, because any error or ambiguity in the solicitation was apparent to the plaintiff before the closing date of the solicitation, the plaintiff's challenge to the solicitation's price evaluation methodology was barred under *Blue & Gold Fleet* ).

---

**20.** The Solicitation provides that "[i]f the offeror finds it necessary to take exception to any of the requirements specified in this solicitation, [the offeror should] clearly indicate in the applicable Volume each such exception with a complete explanation of why the exception was taken." AR 220 (Solicitation).

According to plaintiff, "CSI did question the issue of the timing of placement on the SBA List, prior to submitting its [P]roposal." [21] Pl.'s Resp. 14. Plaintiff claims that, prior to submitting its Proposal, Mr. Parker informally questioned Mr. Sido, the contract specialist and point of contact listed on the Solicitation, AR 144, 147 (Solicitation), and the information provided by Mr. Sido resolved Mr. Parker's question, Oral Argument of Mar. 21, 2012 (Argument of Ms. Leslie Boe) at 11:48:56–49:27; *see also id.* at 11:49:28–49 ("And therefore no formal ... protest was filed, no formal questions submitted. Um, so yes the issue was raised as required, and given the resolution, ... there was nothing for ... CSI to further object to."). According to plaintiff, "[d]efendant knew, and knows, CSI raised its concerns prior to closing and it was [d]efendant's response that assured [CSI] [22] there was nothing to dispute." Pl.'s Resp. 17 (footnote added). Plaintiff cites to several paragraphs in its Complaint for the proposition that its "allegations clearly establish the raising and addressing of CSI's concerns and questions, just as [d]efendant suggests is appropriate in its [Motion]." Pl.'s Resp. 16 (citing Compl. ¶¶ 23–27). The court disagrees.

The Administrative Record simply does not support plaintiff's contentions. First, there is no indication in the Administrative Record that CSI raised the timing issue with Mr. Sido prior to submitting its Proposal. *See* AR *passim.* Second, even if CSI had discussed the issue with Mr. Sido, an informal question to the Solicitation's contract specialist does not qualify as the type of objection or challenge contemplated by *Blue & Gold Fleet,* 492 F.3d at 1313; *see DGR,* 94 Fed.Cl. at 201 (stating that the court must determine what actions the protestor took before the closing date of the solicitation and "how diligently [the protestor] continued to press its argument thereafter"). Moreover,

given that the FAR provides that it is the contracting officer (here, Mr. Toste), AR 146 (Solicitation), and not the contract specialist (here, Mr. Sido), AR 1107 (June 28 e-mail from Mr. Sido to the SBA), who has the "authority to enter into, administer, and/or terminate contracts and make related determinations and findings," FAR 2.101, *cf.* FAR 33.103(b) ("Prior to submission of an agency protest, all parties shall use their best efforts to resolve concerns raised by an interested party at the *contracting officer level* through open and frank discussions." (emphasis added)), the court finds unreasonable CSI's alleged reliance on Mr. Sido's alleged advice. The record lacks any indication that Mr. Sido had the authority to bind the government. *Cf.* AR 1107 (June 28 e-mail from Mr. Sido to the SBA) (stating that "[t]he contracting officer, Mr. Christopher Toste, elected not to evaluate the [P]roposal for [CSI] because they were not a HUBZone concern at the time of offer"). CSI's attempt to "tak[e] advantage of the government" must fail. *See Blue & Gold Fleet* 492 F.3d at 1314. The waiver rule of *Blue & Gold Fleet* precludes plaintiff from challenging the Solicitation's requirement that offerors appear on the SBA's List of qualified HUBZone SBCs.

IV. Conclusion

For the foregoing reasons, plaintiff's Motion for Judgment on the Administrative Record is DENIED, and defendant's Cross–Motion is GRANTED. The Office of the Clerk of Court is directed to enter judgment for defendant. No costs.

IT IS SO ORDERED.

---

21. Plaintiff's counsel maintains that this argument neither conflicts with nor is in the alternative to plaintiff's contention that the Solicitation did not require offerors to appear on the SBA's List at the time of submission. Oral Argument of Mar. 21, 2012 (Argument of Ms. Leslie Boe) at 11:48:38–55.

22. Plaintiff's Response actually states: "Defendant knew, and knows, CSI raised its concerns prior to closing and it was [d]efendant's response that assured [d]efendant there was nothing to dispute." Pl.'s Resp. 17. The court understands plaintiff's reference to defendant's assurance to be a typographical error and that plaintiff is actually referring to CSI's alleged assurance that "there was nothing to dispute."